Case number 13-5417, United States of America v. Melvin Beasley, oral argument not to exceed 15 minutes per side. David Bell for the appellant. Chief Judge Batchelder, and may it please the Court. My name is David Bell, and I represent the appellant in this matter, Melvin Beasley. Chief Judge Batchelder, I'd like to reserve three minutes for rebuttal. You may. Thank you. This is a case regarding an indictment for drug sales that occurred in the Western District of Tennessee. Melvin Beasley was convicted after a suppression hearing and a trial and sentenced to 360 months in prison. And in this case, this Court should find that the search warrant that was issued was not sufficient to support probable cause and violated Melvin Beasley's Fourth Amendment rights. This Court should also find that the government's witness, Agent Joe Hoeing, who testified about crack cocaine being absorbed through the skin, was not qualified as a scientific or medical expert, and thus the admission of his testimony was improper. This Court should also find that the supervised release condition imposed that Mr. Beasley undergo drug treatment was unwarranted and improper, and that under a lane, this Court should have required the government to prove Beasley's prior conviction. Now, on that last issue, I know this Court has considered the issue, but we are preserving that for appeal because there are several petitions that have been filed up to the Supreme Court on the issue, and we anticipate that the Court may consider that here in the near future. I'll reserve most of my argument here today as to the first two issues regarding the search warrant and the witness testimony. This was a case where the search warrant that was issued by the judge in this matter, the magistrate judge, was issued when the agent in the matter, Agent Taylor, set forth an affidavit that, by his own admission, was full mostly of boilerplate language and language that was the bare minimum in order to amount to what he considered a probable cause. However, when Mr. Beasley filed a motion to suppress in a suppression hearing, he had the benefit of some of the discovery in the case, obviously, and a prior supervised release violation hearing that he received a transcript of as jinx material in the matter. And in those transcripts, as well as in the affidavit, the agent Taylor stated that the one incident that he talked about in the search warrant affidavit, the one controlled drug buy, first of all, there wasn't any information about the confidential informant or the reliability. What it was really based upon was the fact that there had been one prior controlled buy by this confidential informant or confidential source through Mr. Beasley. However, in that, and what that meant, if I can make sure, is that there had to be some sort of other information that supported probable cause, some sort of other indicia of reliability. And what the government relied upon and what agent Taylor relied upon was his information about that prior controlled buy. The information contained in the affidavit for the search warrant stated that the confidential source had been monitored, that he had been electronically monitored during the controlled buy, that nine grams was recovered during this one controlled buy, and that the agent had equipped him with an audio recording device. It was very, there wasn't any information about the locations involved, either of the first meeting to give this confidential source the money, or of where Melvin Beasley's residence was actually located, other than what was sought to be searched, or any more information about where the actual meeting afterwards took place. There wasn't any allegation that the confidential source was searched before and after this actual interaction with the agent. Instead, and what the magistrate court and the district court relied upon in upholding the search warrant, was this idea that the actual controlled purchase was monitored. What happened was that at trial, when Mr. Beasley finally went to trial and after the motion to suppress was denied, is that agent Taylor got up to testify further, and what we found out were a number of things. We found out that the audio recording or the audio monitoring that was happening was happening through a cell phone, but agent Taylor admitted that the cell phone monitoring was really more for the purposes of making sure that Mr., that the confidential source didn't get in trouble. That is, he would be able to hear him yelling or screaming if somehow the buy went bad or something like that. It still wasn't monitoring, though, was it? Well, it was a type of monitoring, but the problem is that that very vague statement, monitoring, was relied upon by the magistrate court, by the district court, and yet it wasn't the type of monitoring that the agent initially said it was. Remember, the testimony that happened... Well, Your Honor, that information had not come to light until the trial. There must have been some reason that the magistrate judge asked you if you wanted a Franks hearing. Well, that was because the original suppression motion that was filed basically said that things did not happen the way that the agent alleged that it happened. It was very general, but there wasn't... If you had said, yes, I want a Franks hearing, then all of this would have come out. But in order to have a Franks hearing, there has to be sufficient evidence to rely upon or else you're going before the judge without a good faith basis. At that point, the evidence that had been presented was that the testimony from the supervised release violation hearing, the supervised release violation hearing in Mr. Beasley's case, in which the agent said that all three of these were monitored, and there wasn't really any other information. We didn't know that the button cam on that third purchase... And remember, this affidavit didn't say anything about the prior two purchases, and we have to look at the four corners of the affidavit. There wasn't any information that that button cam had failed during this third one, so that monitoring didn't occur. But it didn't say it was used, did it? Did it say the button cam was used and we monitored him on the button cam? Well, it said... No, Your Honor, it didn't. Again... It said they monitored him. You could monitor somebody actually without a recording device, could you not? You can, but I think part of the problem that we're running into here is that when you get such a bare-bones affidavit, admittedly, by the agent, and the magistrate court and the district court relies upon that recording, and that's what they state in their rulings, then there has to be something more in order for it to amount to probable cause, especially when the confidential source is not revealed and when this other information is not revealed. That's sort of the problem here. And we run into this problem because the agent decided just not to include it. The agent could have included information about the other two buys. The agent could have included information like locations and dates. The agent could have gotten the weight right and didn't even get the weight right in the affidavit. Well, the weight didn't make much difference, did it? Well, it's just one more thing that the agent got wrong. And why? What was the agent doing that caused him to not inform the court of these things? Now, I'll give you one example. He was careless, obviously, but the weight probably didn't make much difference. I understand, Your Honor, but I think that it's the totality. When you look at it, it adds up. One thing I want to point out that the government talked about in its brief and we discussed as well, this was sort of a strange situation where, at the trial, the judge allowed the jury to ask questions of the witness, of Agent Taylor, to see if they had any questions regarding his testimony. There's nothing wrong with that, though. You're not appealing that. Well, no, Your Honor. That's not the issue. All judges don't do it. You're right, Your Honor. You're right. But it's an interesting situation. Here's what occurred, though. The jury had a question regarding that third incident because what happened during that was that Mr. Beasley noticed the button cam and said, is that a camera? What is that? And after that happened, according to the confidential source, he sort of took off, I'll use the words freaked out, and split. And left, right? And the jury asked, so did you hear when he asked about the button cam? And Agent Taylor admitted that he did not recall hearing that, that it was only after the confidential source came back to him that he told them about that. In his own testimony, he admitted to not fully monitoring what was going on. Did he say in the affidavit that he fully monitored or did he say that he monitored? Your Honor, he said he monitored. And he stated that he used a recording device. Well, some recording devices don't work the whole time, as you know. You're right, but he filed that affidavit after the buy had occurred. He could have detailed that. In fact, he could have detailed the first two buys if he had wanted to, where apparently things worked better. He could have detailed many things here. And the problem is that Agent Taylor knew the button camera device didn't work. He knew he wasn't recording any phone conversation, and he knew he had not heard that interaction regarding the button camera on that third incident. So when he filed this affidavit and said that it was being monitored and that there was a recording device attached, he was recklessly misleading the court. He was being reckless with the truth. That's why this is a violation of the Fourth Amendment. That's why Mr. Beasley's rights were violated here. And I want to make sure the court understands what would happen if the court were to find that this was a defective search warrant. The three incidents that occurred that were alleged against Mr. Beasley, the three buys, those still, that evidence was recovered by the agent. It was secured. It was tagged. The government could still try Mr. Beasley on those counts. And the government could still go through that process. But the search warrant revealed a more substantial amount of drugs. And that search and finding those drugs helped to bolster the government's case when it went to trial. So not only did it prejudice Mr. Beasley, the actual 70 grams of crack cocaine that was recovered in the search that was improper under this defective search warrant, but still Mr. Beasley could be prosecuted by the government for those three alleged buys. And the reason why I point that out is that it's not just letting Mr. Beasley go or giving him a free pass. It's just saying that agents like Agent Taylor need to be specific. They need to not be so reckless with the truth. Well, in almost every case where somebody gets a search warrant, they could have put more things in there. You're right. There's a lot of cases that say you shouldn't be so restricted because they're just officers and they put in what they remember. None of them are perfect that I've seen. It was filed the day after this happened, Your Honor. It was fresh in his mind. He had reviewed the non-recording from the button cam, yet he still decided not to include it. And, Your Honor, that means... I don't know why he didn't include the other buys, but that would have bolstered it a whole lot more. Thank you. Please, the Court. My name is Daniel French, and I represent the United States in this matter. The first thing I want to clear up here with regards to what Mr. Bell just argued is that the defense in their brief has conceded that the search warrant had probable cause within the four corners. That's not an issue for this Court at this point. They have conceded that issue. They wrote in their brief here, the information contained in the four corners of the affidavit did provide the issuing judge a fair probability that evidence of a crime would be found on the premises. That's on page 28 of their brief. So the only issue before the Court at this point is whether or not, after Officer Taylor testified at trial, there was a basis for them to file a Franks motion or a motion for a new trial or a motion for a Brady violation or whatnot. The attorney at trial was obviously different than the attorney is now. I don't know if the Court was aware of that. But after trial, Mr. Beasley filed a complaint against his attorney, and the judge removed him and appointed the federal public defender at that point, which handled him for sentencing purposes. The attorney Mr. Beasley had at trial was the attorney that had filed two suppression motions. He had done extensive research for Mr. Beasley. He even filed a motion right before trial arguing that Mr. Beasley's supervised release violation was essentially placing him in double jeopardy for purposes of his indictment and whatnot. So he's doing a lot of research for him, and he's the judge that at the suppression hearing he was asked specifically if he was wanting to make a Franks motion. He said, well, I want to research that more. I want to come up with more of that. But he never did. He never filed a Franks motion. Did he file one in the middle of a trial after the officer testified? Your Honor, I believe consistent with the McCreary decision in which the defense did. The defense in the McCreary decision didn't file that during the trial. But after the trial, they filed a motion for new trial, and they also filed a motion alleging a Brady violation. So that allowed the district court at that point to at least consider the information or the accusation that the officer at trial testified differently than what was in the affidavit. In this instance, the attorney that was very familiar with the case at trial, after hearing Officer Taylor's testimony, saw no problem with the testimony. He saw no inconsistency. He filed no such motion. In fact, he was an attorney. I think he stayed on the case all the way up to right before sentencing. He filed a position paper for the defendant. He never alleged anything about this issue. And I'll note that the defense in their appellate brief, they're not alleging he was ineffective. They're not trying to claim that he was ineffectively representing Mr. Beasley at all during the course of these proceedings. So that attorney, who was very familiar with the case, who in fact was, we had a supervised release hearing on these very issues in which Officer Taylor testified at that hearing prior to his trial testimony. And at that hearing, he talked about monitoring in broad terms. He was, in fact, asked the question by Mr. Beasley's counsel at that supervised release hearing. Just to be clear, Mr. Beasley had served, I think, an 8 to 10-year sentence for the same conduct. He'd been convicted in federal court. He gets out of jail. He's on federal supervised release. And he goes back to his residence, and he starts selling crack cocaine again. That's why he got on the radar of law enforcement officials again. And so at his supervised release hearing, the defense attorney asked Officer Taylor these same questions. He said, you know, how are you monitoring him? What was going on? And Officer Taylor said, well, I was monitoring him. I gave him controlled currency. I searched him before and after he went over there. He said, I told him to turn his cell phone on so I could listen to him for safety purposes. And then he said, we equipped him with an audio-video device. And there was a lot of questions about, well, does this audio-video device work in real time? And he said, no. He said, no, it doesn't work in real time. They go, and then he brings it back, and then we review it. And he goes, but we are monitoring him. We have a cell phone turned on. We're giving him controlled currency. We're searching him before and after. You know, Officer Taylor used the word monitor. I think if you look at the affidavit and the way it's structured, certainly it could have been written better. I mean, I've never seen an affidavit, just like Judge Seiler said, that couldn't have been written better. And I wish they would put every little fact in. I think in this case, even though they had made three undercover buys from Mr. Beasley, they only focused on the last one because at that time they were trying to protect the identity of the CS. They didn't want to put in the affidavit, on this date, this date, and this date, we made a buy from Mr. Beasley because they were worried that he was going to identify who this person was. In fact, this person who testified at trial, his name was Mr. Ernell Hoyle, I think he has some kind of relation to Mr. Beasley. And he was scared of him. So the officers tried to protect him. They only focused on that one buy at the end. But if you look at the affidavit when- His name wasn't mentioned in the affidavit. That's correct. When we look at the affidavit, though, and what the defense concedes establishes probable cause, at no point did the magistrate judge, in issuing her report and recommendation, or the district court in adopting that report, at no point did they focus on the word monitoring or did they give that much weight. In fact, if you look back at the report and recommendation, as well as the district court's decision, the reason they found probable cause was that the affidavit outlining Officer Taylor's extensive experience talks about that there was heavy foot traffic back and forth to the residence, that they used a confidential source to go make a buy, that they gave controlled currency to, and the district court, in fact, focused on the fact that the CS actually went and made the buy. So this wasn't like an anonymous tip, and then they just go to the residence and they observe traffic like in the buffer case. I think the defense in a 28-J letter cited to the Ronnie Buffer case in support of their argument. Well, this case is totally different. In the Buffer case, the officers had a command complaint, whatever that is, and they go over to the house. They see some people go back and forth. They stop one of them. He has some marijuana. And then they go get a search warrant. Well, in this case, the officers, after observing heavy foot traffic, after getting the information, took a CS that was known to them, equipped him with an audio-video device, searched him before and after the transactions, wired him up with an audio-video, sent him over there, told him to keep his cell phone on so in case he starts to scream, they can go save him. And then he comes back. He gives them the cocaine. It tests positive. All that's in the affidavit. All that's in the affidavit. And, again, they've conceded that that establishes probable cause. So our position is that because this wasn't raised until appeal, that they've waived it. And the McCreary decision supports that. They have waived this whole Franks issue at this point. And that's consistent with the history and the understanding of Rule 12e. What's the position if we were to decide that they hadn't waived it? If you hadn't waived it, I think the McCreary decision leaves open the possibility of a plain error review. But it's our position first that they've waived. But if the court examines it under plain error, it's our position that they can't establish that the court plainly erred by not, I guess, suddenly after hearing Officer Taylor's testimony at trial, suppressing the evidence. I mean, Officer Taylor, as we've noted, was very honest. He testified consistently with his supervised release testimony. He never said that they could monitor them live. And then he's asked this question, as the defense counsel noted, he's asked this question by the jury. This was my first trial, actually, where a judge has allowed the jury to ask questions, so that's a little bit scary. But the jury asked this question because they had heard from Mr. Hoyle, the confidential source. Mr. Hoyle claimed that during the third transaction, Mr. Beasley spotted the button cam that he was wearing and asked him what it was, and he got scared, and he got his crack cocaine, and he got out of there as quick as possible. So the jury wanted to know from Officer Taylor if he had heard that over the cell phone. But their question was limited to that one conversation. Did you hear him say that he saw the button cam? And Officer Taylor said, well, first of all, let me explain, I can't always hear what's going on. He didn't say he couldn't ever hear. He just said, I couldn't always hear what's going on. And then he says, I didn't hear that specific conversation. And then he sort of almost off the cuff says, you know, there may have been one time where he didn't turn the cell phone on, and then he sort of stops mid-sentence, and he says, well, Mr. Hoyle came back and told me about that conversation. In their brief, the defense tries to construe that comment as saying that, you know, Officer Taylor admitted that on April 19th the phone was never on during that transaction. Well, that's not what he said at all. It was an off-the-cuff remark of, well, I'm not sure, but maybe there was one time. Well, there were three separate purchases here. And the defense was then given the opportunity to cross-examine Officer Taylor on that statement. No follow-up questions about that statement. They didn't ask about what he meant, which time the phone may or may have not been cut off. There were no follow-up questions about that. And there certainly wasn't a motion at that point for the court to maybe re-examine the affidavit, which I think would have been a problem. If they really felt that way, I think there is an avenue for the defense to do that. And there's certainly an avenue and a motion for new trial. And that motion was never made. So this is being brought up for the first time on appeal. As for, if the court will permit me, I'll move on to Officer Hoeing. The defense, obviously, in their second issue is alleging that Officer Hoeing, who has over 30-some-odd years of law enforcement experience, that he was not qualified to testify that the reason drug dealers might wear latex gloves is that they could absorb the substance through the skin. They're characterizing that as a medical opinion that he was not qualified to make. Well, first of all, I'd note that in our Rule 16 discovery letter, we clearly notified the defense that Officer Hoeing was qualified to testify about the packaging of controlled substances and the methods of distribution. In fact, when he was voir dired extensively by both the government and the defense at trial, he testified about classes that he's had, which discuss the effects that crack cocaine can have on people that use and distribute it. He even talked about how in the classes when they were handling the substance, they were told to wear gloves so that they wouldn't absorb it through the skin. And so the defense in their brief at page 40, 41, and 46, they concede that Officer Hoeing was qualified to testify about the packaging and distribution of drugs. So that's important. They concede that. Then at page 46, they concede that he properly testified that drug dealers wear gloves to not get crack cocaine on themselves. So they concede that. Their problem is with the why. So they thought the jury should just hear, well, they wear gloves to get crack cocaine on themselves, but we shouldn't have been allowed to say, well, why is that? So that's where they have the problem. Well, there's a purpose of that, just to show that since gloves were found, then that makes him a dealer. It went to the distribution element, but it also helped explain in the videos, there were two undercover videos that worked from the first two purchases, and he's seen, I mean, his face, I mean, he's sitting there. I mean, it's the best video I've had since being a United States attorney. He's sitting there at the table, clearly, and he's putting gloves on, and he's weighing it up, and he's cutting it, and it's sitting there on the digital scale. And so what the effort was here was to explain why would he put these gloves on. He was also on supervised release at the time and was subject to drug testing. Mr. Jayram and his attorney at the time in Vore Dyer had told the jury he was going to testify. In fact, they were so confident he was going to testify, they went ahead and fronted the fact that he was a convicted felon and had multiple felony convictions to the jury to see how these jurors would react. So this was almost like it was a way of setting this up to say, well, if he testifies, we're going to ask him about being drug tested, and this would show why he was putting gloves on because it could be absorbed through the skin. So we asked why. Why did Officer Hulling say they should do that? That's what he testified to. So we submit that that's consistent with his training. It's consistent with what we notified him under Rule 16. And in any event, we submit it's harmless for the reasons I just stated. I mean, the evidence, I would say simply put, was just overwhelming. We had video of him doing it. We had the substances in court. The CS actually testified, identified him in court, testified about all three transactions. We had the officer testify about the search warrant. And then you even have the judge at sentencing talked at length, and we quoted it in our brief. He talked at length about how the defendant, when he testified, did more harm to himself than good because he tried to claim he was handling some root called John the Conqueror, and he was weighing it up, and it just happens to look like crack cocaine when you cut it up. And the judge said it was laughable and that no rational person could have ever believed it at sentencing. And I'd also note we also had a jury instruction, which instructed the jury that they could accept his evidence for what it was, Officer Hulling's. Just briefly, the supervised release condition, I'd say this is our weakest issue, obviously. The court at sentencing did not speak at length about the condition. However, I do note that the defendant, when he was on supervised release from his previous federal offense, he was subject to drug testing. The PSR, the pre-sentence report actually noted that he had completed a 500-hour drug program at the BOP, which is a very intensive program. It's hard to get into unless you have a long history of substance abuse. It noted that he had prior substance abuse. And it's our position it's not even right for consideration, Your Honors, because it allows the probation office discretion whether it's even submitting to testing and treatment. We don't know whether he'd even have to do that later on. That's correct. It just says at the probation officer's discretion. And finally, with regards to a lien, I think Mr. Bell conceded this. The court in U.S. v. Wins already held that a lien did not disturb the longstanding rule that prior convictions need not be submitted to a jury to be proven beyond reasonable doubt. And I have no further. My time is up. Thank you very much. Counsel? Rebuttal? Yes. Thank you. The government brought up a number of different issues on the agent hoeing information regarding why it is that we are objecting to the testimony regarding crack absorption through the skin. While it is true that the government provided a letter talking about packaging and distribution of crack cocaine, it certainly did not detail any sort of scientific or medical training of officer hoeing or agent hoeing, excuse me. It did not detail any of that. And I think part of the reason that it is so important and part of the reason, there are really two very good reasons. One is that in the government's own closing statement, the government comes in and makes this connection between Mr. Beasley being on supervised release and that he would not have wanted to, that he was wearing gloves because he could possibly absorb the crack cocaine through the skin and then would test positive on supervised release, so that's why he was wearing the gloves. Now, Mr. Beasley had testified about this drug, John the Conqueror, and that that's the reason why he was wearing gloves. What is John the Conqueror? I've never heard of that thing. It's sort of a synthetic and herbal type of drug that is used, I believe, to be... To eat out of it or something? Well, Your Honor, I'm not sure exactly how they use it, except I know that the purpose is sort of as a, to be as frank as possible, male enhancement. And that's my understanding of John the Conqueror. But part of the issue there is that the government directly tied that in to Mr. Beasley as a reason why he was wearing the gloves, because he didn't want to violate his supervised release, because crack could be absorbed through the skin. But there was no notice of any sort of crack being absorbed through the skin in Officer Agent Hoeing's background. And Mr. French, the government, states that there was information that he had been through training before. We don't know anything about the basis of knowledge that he has that he believed that crack could be absorbed through the skin. We weren't provided any notice of that. We could have called an expert. We could have called some sort of, looked for studies of whether crack gets absorbed through the skin. But instead, we simply were never provided that information. And that's the problem there. And the reason why it's important, the reason why it's not just plain error or clear error, the reason why it is plain error or clear error, excuse me, is that that was something that the government used to tie it all together in their closing. And if they had not used it for such a purpose, then it might be something that could just be strewn to the wayside. What was the prejudice to your client on that? Because they already had seen these videos and heard all this testimony about the sale of this drug and so forth. Well, they had seen the videos, but he had testified. Chief Judge Batchelder, I assume. Yes, please answer the question. They had seen the videos, but he had given an explanation that what he was doing... John the Conqueror, yes. ...was John the Conqueror. So he had given an alternate explanation. But what the government did is they used Agent Hoeing's testimony regarding crack absorption through the skin to bolster their argument and bring it back together, and that was the prejudice. Thank you. Thank you, counsel. The case will be submitted.